Memorandum of Decision
On October 2, 1998, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Alex G. and Rosanna B. to their minor daughter, Alize G. Trial took place in this court on July 24 and 28, 2000. For the reasons stated below, this court now grants the petition.[2]
THE FACTS
The court finds the following facts and credits the following evidence. The mother, Rosanna B., was born in 1979. There was abuse in the maternal grandmother's home where the mother grew up. The mother left CT Page 9417 school after the ninth grade, became part of a gang, used narcotics, and was involved in the juvenile justice system. In 1995, when she was sixteen, the mother became pregnant with Alize. The mother used marijuana during her pregnancy.
The father, Alex G., was born in 1976. He had a similarly troubled youth. In January, 1996, the father was arrested for possession and sale of narcotics. He was convicted of sale of narcotics in May, 1996 and sentenced to three years of probation.
Alize was born on February 17, 1996, testing positive for marijuana. For that reason, and because of concerns about domestic violence and the mother's homelessness, DCF obtained an order of temporary custody. When Alize was discharged from the hospital, DCF placed her in the foster home of Sonia B. Alize remains there today.[3]
The court adjudicated Alize neglected on June 6, 1996 and imposed expectations for the parents to meet. DCF referred the parents to counseling for domestic violence, substance abuse, and parenting. Aside from a domestic violence course completed by the father, the parents failed to complete these programs prior to the filing of the termination petition in October, 1998. DCF also referred the mother to a job training program and a supervised living environment for teenage mothers, but the mother failed to follow through. The father tested positive for marijuana in late 1996. At times, the parents failed to keep their whereabouts known to DCF.
Visitation between the parents and Alize took place on a fairly regular basis until the fall of 1997. The mother and father, however, argued during several visits. In the fall of 1997, the father was arrested for domestic violence involving the mother and the couple separated. The father attended only two visits in 1998 — one in May and one in August — and then stopped visiting altogether. At the two 1998 visits, Alize did not recognize her father. The father has not sent Alize any cards or letters.
The father was arrested in December, 1999 for assaulting a former girlfriend. He has not maintained contact with DCF or the foster home. His whereabouts are unknown. He failed to appear for trial.
In late 1997, the mother became pregnant through a new boyfriend. She resumed use of marijuana. Between January and August, 1998, the mother attended only five of twenty-eight scheduled visits with Alize. The mother appeared at the May 1 visit with multiple bruises. On May 3, her new boyfriend was arrested for domestic violence. On July 29, 1998, her new son, Angel, was born. CT Page 9418
The mother moved in with the maternal grandmother in September, 1998. DCF then transported Alize to visits at the maternal grandmother's home. At the outset, the mother and Alize interacted appropriately and the visits went well. The mother took Alize out to lunch for her birthday in February, 1999 and occasionally gave her other gifts. Beginning in July, 1999, however, Alize began to resist going to visits. The mother occasionally made inappropriate comments in front of Alize criticizing her foster home or suggesting that Alize might go home with her soon.
In March, 1999, the mother completed a program designed to preserve her relationship with her son Angel. But her attendance was sporadic at parenting classes during the same time period. The mother tested negative for drugs in March, 1999 and January, 2000, although she refused several other drug tests.
The mother attended a court-ordered psychological evaluation in July, 1999. The psychologist found that, while the mother was appropriate with Alize, she appeared more as a familiar adult rather than a psychological parent. The psychologist reported that the mother did not take any responsibility for her daughter's situation and was quick to find excuses for her own failings. The evaluation revealed that the mother met the criteria for antisocial personality disorder and showed signs of bipolar disorder. The evaluator recommended that the mother see a mental health professional for further diagnosis and possible treatment. DCF then referred the mother to psychiatric services but the mother failed to accept them.
At some point in early 1999, the court adjudicated Angel neglected and placed him with his father under DCF protective supervision. The court extended the protective supervision in October, 1999 and imposed a condition that the mother have no overnight visits with Angel.[4] In defiance of this condition, the mother married her boyfriend and moved in with Angel and him.
At two visits in late 1999, the mother paid little attention to Alize because she was talking about her upcoming wedding. The mother canceled a visit in early January, 2000 because she had just moved in with her new husband and son. The foster mother then proposed that the mother visit Alize at the foster home. The mother visited on February 17, 2000 — Alize's fourth birthday. Since that time, the mother has not visited. She has, however, called Alize and made false promises.
On March 7, 2000, the mother was arrested because of a domestic dispute with her husband during which her son was present. Recently, the mother's husband has informed DCF that he does not know where the mother lives. CT Page 9419 She has failed to contact DCF or attend recent court appearances. She did appear at the trial, albeit two hours late on the first day, and testified on her own behalf
Alize is now four years old, healthy, and developmentally on target. She has recognized her mother at past visits but called her "Rosie." Alize feels that she is part of the foster family, which includes Sonia B., three older, biological children and their father, and several other foster children. Alize can speak English and Spanish and has learned about her Hispanic-American heritage. Alize calls her foster mother "Mom." The foster mother would like to adopt Alize if she becomes legally available.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes § 17a-112
(c)(1).[5] The court, however, need not make a reasonable efforts finding "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b [dealing with commitment extension hearings and permanency planning for committed children] that such efforts are not appropriate." General Statutes § 17a-112
(c)(1). In the present case, the court found at a June 4, 1998 extension hearing that further efforts to reunify were not appropriate. Accordingly, the first statutory element has been satisfied.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919,722 A.2d 807 (1998); General Statutes § 17a-112 (c)(3). In this adjudicatory phase, the court is ordinarily limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
Because there were no amendments in this case, the adjudicatory date is October 2, 1998, the date of filing of the original petition. The petition alleges the grounds of abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship against both parents. The CT Page 9420 court finds that DCF has proven all grounds by clear and convincing evidence except for abandonment against the mother.
1. Abandonment
General Statutes § 17a-112 (c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re MigdaliaM., 6 Conn. App. 194, 208-209, 504 A.2d 533, cert. denied, 199 Conn. 809,508 A.2d 770 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id, 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id., 210.
The father clearly abandoned Alize. He stopped visiting regularly in October, 1997. He visited her only twice in 1998 and then ceased visiting altogether. He has not sent her cards or letters. The mother's visitation record is poor between January and August, 1998. Because she resumed regular visitation before the end of the adjudicatory period, however, the court will not find that she abandoned Alize. The court will nonetheless consider her poor visitation record earlier in 1998 in relation to the other adjudicatory grounds.
2. Failure to Rehabilitate
The ground of failure to rehabilitate arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B). No dispute exists that the court adjudicated Alize neglected on June 6, 1996, thus satisfying one element of the statute.
The remainder of the statute requires an inquiry into whether the parent has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112
CT Page 9421 (c)(3)(B). The court should determine the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'" Inre Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). "In assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In reDanuael D., 51 Conn. App. 829, 840, 724 A.2d 546 (1999). The statute, however, does not require parents "to be able to assume full responsibility for [a] child, unaided by available support systems." Inre Juvenile Appeal (84-3), 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).
Both parents failed to rehabilitate. The father's only accomplishment was to complete a domestic violence course. After finishing the course, however, the father was arrested for a domestic incident with the mother. The father did not fulfill requirements to attend counseling for parenting skills or substance abuse. He tested positive for marijuana at the end of 1996. The father did not keep his whereabouts known to DCF. He stopped visiting his daughter and has no relationship with her.
The mother did not complete even one rehabilitative program during the adjudicatory period. Undoubtedly as a result, when the mother was pregnant again in 1998 through a new boyfriend, she repeated the cycle of using marijuana and being victimized by domestic violence. She also did not keep her whereabouts known to DCF at all times. She all but abandoned Alize during the first eight months of 1998. Consequently, her relationship with Alize suffered. By the end of the adjudicatory period, the mother "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112
(c)(3)(B).
3. No Ongoing Relationship
The final statutory ground alleged in this case is that there is "no ongoing parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112 (c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its CT Page 9422 former existence it has now been completely displaced." (Internal citation omitted.) In re Juvenile Appeal (Anonymous), 181 Conn. 638,645, 436 A.2d 290 (1980). "The feelings of the child are of paramount importance . . . The ultimate question is whether the child has no present memories or feelings for the natural parent." (Internal citations omitted.) In re Shane P., 58 Conn. 234, 240, ___ A.2d ___ (2000).
In this case, Alize did not even recognize her father when they last visited in 1998. The mother's poor visitation record for eight months in 1998 undoubtedly hurt her relationship with her daughter. Alize referred to the mother as "Rosie" rather than "Mom." The evaluation conducted shortly after the adjudicatory period found that the mother is more of a familiar adult than a psychological parent. The court accordingly finds the evidence to clearly and convincingly substantiate the ground of no ongoing parent-child relationship against both parents.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. See Practice Book § 33-5.
The best interest of Alize G. strongly favors termination of her parents' rights. The father was arrested again in December, 1999. He failed to appear for trial and his whereabouts are unknown. The father has now abandoned Alize for at least three years. He is not a father to her; he is a stranger.
Rosanna B. is a more sympathetic figure because she became a mother as a troubled teenager. Nonetheless, if Alize is to avoid the same fate, then the mother must find the maturity to fulfill the responsibilities of a parent. The mother, however, failed to rehabilitate during the adjudicatory period and, even though the court gave her additional time, still has not rehabilitated. She does appear to be drug-free, although she resisted drug tests on several occasions. She did visit with Alize regularly for over a year starting in September, 1998, but the quality of those visits deteriorated as the mother made inappropriate comments or failed to pay attention to her daughter. Undoubtedly as a result, Alize began to resist going to visits and does not recognize Rosanna as her psychological mother.
The mother completed one program designed to preserve her relationship with Angel, but then violated a clear court order in his case, thus jeopardizing that very relationship. The mother did not complete any CT Page 9423 other rehabilitative program in the post-adjudicatory period. Her defiant attitude and her failure to take responsibility for her own actions confirms the psychologist's opinion that the mother is still much in need of mental health counseling.
In the last five months, the mother has extinguished any remaining chance she had of reunifying. She has completely failed to visit Alize despite ample opportunities to do so. Her phone contact with her daughter has been inappropriate. The mother was arrested in March for a domestic dispute involving her husband at which her son was present. Her whereabouts have become unknown. The mother has failed to appear in court except for this trial.
Alize has lived with her foster family since birth. She is understandably bonded to them. She is doing well in the foster home. The foster mother, in turn, would like to adopt Alize. Such an adoption, for all the reasons stated, is in Alize's best interest. Termination of parental rights will make this adoption legally possible.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112
(e). See In re Tabitha P., 39 Conn. App. 353, 362, 664 A.2d 1168 (1995). These factors serve only to guide this court in making the ultimate decision whether to grant the termination petition and no one finding is a prerequisite. See In re Eden F., 250 Conn. 674, 691, 741 A.2d 873
(1999). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
DCF referred the parents to substance abuse, domestic violence, and parenting programs, facilitated visitation, offered vocational training to the mother, and arranged for a psychological evaluation of Alize and the mother. These services were relevant to the parents' needs and offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to CT Page 9424 by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On June 6, 1996, the court entered the following expectations for the parents to meet to facilitate the return of Alize to their custody: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and their attorney, (3) visit the child as often as DCF permits, (4) participate in counseling for parenting skills, domestic violence, and substance abuse, and follow recommendations, (5) sign releases as requested, (6) secure and maintain adequate housing and income, (7) refrain from substance abuse, and (8) have no involvement in the criminal justice system. As discussed, the parents' compliance with these expectations was poor.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Alize does not recognize her father and does not regard Rosanna B. as her mother. Alize is closely attached to her foster mother.
5) The age of the child.
Alize was four years old on February 17, 2000.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that parents did not adjust their circumstances in time to make it in Alize's interest to return to their home. The father failed to maintain contact with Alize after August, 1998. The mother maintained contact sporadically until February, 2000, when her whereabouts became unknown.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent. CT Page 9425
As discussed above, the parents' difficulties stem primarily from their own lifestyle choices and not from unreasonable interference by each other or any third person, or from economic circumstances. The mother has been the victim of domestic violence, but has not taken advantage of opportunities she has had to address this problem.
CONCLUSION
Based on the foregoing findings, the court hereby grants the termination petition. The Commissioner of DCF is appointed statutory parent for Alize for the purpose of securing an adoptive family. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman Judge, Superior Court